UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
JEFFREY MANUEL AMARAL,              )
                                    )
                 Plaintiff,         )
                                    )    CIVIL ACTION
        v.                          )    NO. 09-12041-WGY
                                    )
COMMISSIONER OF SOCIAL SECURITY,    )
                                    )
                 Defendant.         )
                                    )
```

MEMORANDUM OF DECISION

YOUNG, D.J.                                        July 13, 2010

## I.    INTRODUCTION

     The plaintiff, Jeffrey Manual Amaral ("Amaral"), brings this
action pursuant to section 205(g) of the Social Security Act, 42
U.S.C. § 405(g), seeking judicial review of the final decision of
the Commissioner of Social Security (the "Commissioner").  Amaral
challenges the decision of the Administrative Law Judge (the
"hearing officer") denying his application for Supplemental
Security Income and Social Security Disability Insurance
Benefits.  He argues that the Commissioner's decision is not
supported by substantial evidence and is based upon violations of
Social Security Administration regulations.  Pl.'s Mem. Supp.
Summ. J. ("Pl.'s Mem.") 3, ECF No. 12.  Amaral requests that this

Court reverse the decision of the Commissioner or, in the alternative, remand the case to the Commissioner. Pl.'s Mem. 2. The Commissioner filed a motion for an order affirming his decision. Def.'s Mot. Order Affirming Decision Comm'r, ECF No. 14.

**A.    Procedural Posture**

Amaral applied for Social Security Disability Insurance Benefits and Supplemental Security Income on February 5, 2008. Admin. R. 99-112. He alleged a disability onset date of January 25, 2008. Id. at 99, 106. The applications were initially denied on April 2, 2008, and again upon reconsideration on May 30, 2008. Id. at 57-62, 65-70. After being twice denied, he requested an oral hearing on Dec. 18, 2008. Id. at 71. Amaral and his attorney attended the hearing on May 28, 2009. Id. at 20.

On June 17, 2009, the hearing officer issued a decision concluding that Amaral was not disabled. Id. at 9-11. The Decision Review Board (the "Board") selected Amaral's case for review, and soon thereafter Amaral requested an additional thirty days to submit additional documents. Id. at 8. Specifically, in a letter dated July 13, 2009, Amaral requested that the Board consider the hearing officer's "failure to follow the medical opinions of Melissa Cordiero LMHC." Id. at 5. By September 23, 2009, the Board had not completed its review, thus the hearing

officer's decision became the final decision of the Commissioner. Id. at 1. On November 25, 2009, Amaral filed the present action with this Court to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g). See Compl. 1, ECF No. 1.

## B. Factual Background

Amaral was born on July 11, 1977. Admin R. 99, 106. He has a high school education and has worked as a cook, dock supervisor, press feeder, warehouse worker, and most recently a warehouse selector. Id. at 151, 155.

Beginning at least as early as April 2006, Amaral has been under the care of Dr. Charles Eil, an endocrinologist, for his type 1 diabetes mellitus. See id. at 234. Amaral visted Dr. Eil, on average, approximately once every three months. See id. at 230-238, 308-18. Dr. Eil frequently noted Amaral's inconsistent hemoglobin A1c readings and noncompliance with treatment instructions for regulating his diabetes. See id. at 230, 234, 309, 312. In April 2008, Dr. Eil noted that Amaral's diabetes was not well controlled "due to lack of commitment to checking his blood sugars and poor motivation." Id. at 312.

Amaral suffered a back injury at work in November 2006, for which he saw Dr. Ajit Mirani on January 5, 2007. Id. at 224. Dr. Mirani diagnosed him with a right-sided thoracic strain. Id. After a number of follow-up visits and completion of a physical therapy program at New England Rehabilitation Hospital, Amaral

was "for the most part asymptomatic," reported no lumbar or thoracic tenderness, had full range of motion and strength of both upper and lower extremities, and was able to lift up to 100 pounds. <u>Id.</u> at 208.

In January 2008, Amaral began seeing Dr. Marivyl Laxer, an internist, as his primary care physician. <u>Id.</u> at 239-46, 286. Dr. Laxer evaluated Amaral's diabetes, concluding that his prognosis was "good." <u>Id.</u> at 239. In March 2008, Dr. Laxer completed a medical report for the Massachusetts Department of Transitional Assistance. <u>Id.</u> at 601. She determined that Amaral was disabled due to depression but noted no physical limitations. <u>Id.</u> at 603, 605-06. She also remarked that Amaral was forgetful, had difficulty handling multiple tasks at the same time, and did not interact well with co-workers. <u>Id.</u> at 606. Overall, however, Dr. Laxer concluded that Amaral's prognosis with respect to his mental functioning was good. <u>Id.</u>

Also in March 2008, Dr. Carol McKenna, a consulting psychologist, found that Amaral suffered from mild to moderate intermittent anxiety, but she did not classify it as severe. <u>Id.</u> at 250, 255. Dr. McKenna based her opinion on Dr. Laxer's treatment notes as well as Amaral's own statements. <u>Id.</u> at 262.

That same month, Dr. Maria Gorbovitsky, a consulting physician, completed a physical residual functional capacity assessment for Amaral, indicating that he can occasionally lift

4

up to 50 pounds, frequently lift up to 25 pounds, and stand and/or walk for about six hours in an eight-hour workday. Id. at 263-64. She also noted some limitations in climbing and balancing and found Amaral's physical complaints to be credible. Id. at 264-65. Dr. Gorbovitsky based her opinion on notes from an ophthalmology appointment Amaral had attended in November 2007, Dr. Eil's notes from January 2008, and Amaral's own statements. Id. at 264.

In April 2008, Amaral started seeing Melissa Cordeiro, a licensed mental health counselor, at Family Service Association. Id. at 548. Amaral visited Cordeiro nearly every month until April 2009. See id. at 287-89, 512-14, 530-53, 757-63. After each session, Cordeiro completed a progress report by selecting a box, corresponding to Amaral's overall progress, from the following options: mild improvement; moderate improvement; major improvement; remains stable; worsening condition; no progress; other. See, e.g., id. at 287. Of the fifteen progress reports, thirteen indicated that Amaral "remain[ed] stable," while one report in June 2008 indicated "worsening condition" and one report in August 2008 indicated "mild improvement." See id. at 287, 289, 512-13, 533-34, 536-539, 543-44, 761-63.

Later in April 2008, Amaral was admitted to Tobey Hospital for severe nausea and vomiting with blood. Id. at 385. After CT scans and an upper endoscopy, he was diagnosed with upper

gastrointestinal bleeding, appendicitis, diabetic ketoacidosis, uncontrolled diabetes, hypertension, and anxiety disorder. Id. at 278, 359, 385. When the bleeding, abdominal pain, nausea, and vomiting were resolved a few days later, he was discharged with instructions to monitor his blood sugar closely. Id. at 385-86.

On May 6, 2008, Dr. Laxer submitted a treating physician report to Massachusetts Rehabilitation Commission Disability Determination Services. Id. at 285. In this report, Dr. Laxer noted that Amaral suffered from depression with anxiety disorder manifested in crowds and unfamiliar places. Id. She also reported that Amaral felt pressure at work, which contributed to his anxiety. Id. Amaral's diabetes contributed to his difficulties at work, as, prior to January 2008, he suffered fainting episodes at work related to low blood sugar. Id. Dr. Laxer did not, however, conduct any psychological testing as part of completing this report. Id. at 286.

That same month, Dr. S. Fischer, a consulting psychologist, completed a mental residual functional capacity assessment. Id. at 305-07. Dr. Fischer found moderate limitations in Amaral's sustained concentration, persistence, and ability to respond appropriately to changes in the work setting. Id. Dr. Fischer did not find Amaral to be markedly limited in any areas. Id. While Dr. Fischer found that Amaral had no impairment, he found Amaral's complaints "generally credible." Id. at 307. Dr.

Fischer based his opinion on Dr. Laxer's notes from January 2008 to May 2008 and Amaral's own statements. Id. at 304.

On June 4, 2008, the University of Massachusetts Medical School Disability Evaluation Services program determined that Amaral was disabled under state standards and that the disability was expected to last through December 4, 2008. Id. at 583. Despite this determination, the program found that Amaral's impairments did not meet or equal criteria in the Supplemental Security Income listing of impairments and that he was capable of basic unskilled work. Id. at 586-87.

Also in June 2008, Amaral began seeing Dr. Kevin Hill, a psychiatrist at Family Service Association. Id. at 527-28. Amaral complained of depression, anxiety, and difficulty controlling his diabetes. Id. At the initial visit, Dr. Hill reported that Amaral was logical, oriented, with grossly intact attention and concentration, intact memory, and good eye contact, and had no suicidal or homicidal ideation. Id. Dr. Hill also noted that it was unclear why "a bright man has such difficulty managing his diabetes" and suspected that Amaral's alcohol use of three to seven beers on weekend nights was "exacerbat[ing] his affective problems." Id. at 527-28. Dr. Hill assigned Amaral a global assessment of functioning ("GAF") score of 45.[1] Id. at

---

[1] A GAF score between 41 and 50 represents "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social,

528.

In January 2009, Dr. Laxer completed a medical impairment questionnaire for the University of Massachusetts Medical School Disability Evaluation Services program. Id. at 780-88. She noted Amaral's noncompliance in treating his diabetes but again found no physical limitations. See id. She did not complete a mental evaluation, instead deferring to Amaral's treating psychiatrist. Id. at 783. Around the same time, Dr. Laxer completed a medical report for the Massachusetts Department of Transitional Assistance, finding Amaral's depression disabling but indicating no physical limitations. Id. at 565-71.

In February 2009, Cordeiro completed a mental residual functional capacity questionnaire. Id. at 549-53. She diagnosed Amaral with anxiety disorder due to his diabetes and dysthymic disorder. Id. at 549. At the time, she assigned Amaral a GAF score of 35,[2] and noted that his highest and lowest scores within the past year were 45 and 31, respectively. Id. at 549. She

occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 34 (4th ed., text rev. 2000).

[2] A GAF score between 31 and 40 represents "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids freinds, neglects family, and is unable to work . . . .)." DSM-IV, supra at 34.

determined that Amaral's mental impairments, due to his "preoccupation with diabetes," rendered him unable to meet the competitive standards of a work environment in five categories and that he had no useful ability to function in three other categories. Id. at 551-52.

In early March 2009, the University of Massachusetts Medical School Disability Evaluation Services program extended Amaral's disability period to December 6, 2009. Id. at 555.

On March 24, 2009, Amaral was involuntarily hospitalized at Arbour Hospital for attempted suicide by overdose of Seroquel. Id. at 611. At admission, he had a GAF score of 35 and was diagnosed with major depression. Id. at 631, 639. Amaral told Arbour Hospital that his last drink of alcohol was on the day before his suicide attempt. Id. at 653. A week later, on March 31, 2009, he was alert, oriented, and stable, and discharged from the hospital. Id. at 613. Approximately eight days after his discharge, Cordeiro reported that Amaral had cleaned his room and felt good about quitting smoking. Id. at 757.

## II. LEGAL STANDARD

### A. Standard of Review

Under 42 U.S.C. § 405(g), a district court has the power to affirm, modify, or reverse a decision of the Commissioner. The district court must make its decision based on the pleadings and transcript of the record before the Commissioner; "[t]he findings

of the Commissioner of Social Security as to any fact, if
supported by substantial evidence, shall be conclusive . . . ."
42 U.S.C. § 405(g); see Manso-Pizarro v. Sec'y of Health & Human
Servs., 76 F.3d 15, 16 (1st Cir. 1996). The First Circuit has
clarified this standard as requiring a court to uphold the
Commissioner's findings if "a reasonable mind, reviewing the
evidence in the record as a whole, could accept it as adequate to
support his conclusion." Irlanda Ortiz v. Sec'y of Health &
Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting
Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222
(1st Cir. 1981)) (internal quotation mark omitted). As it is the
role of the Commissioner to draw factual inferences, make
credibility determinations, and resolve conflicts in the
evidence, the Court must not perform such tasks in reviewing the
record. Id. Complainants face a difficult battle in challenging
the Commissioner's determination because, under the substantial
evidence standard, the Court must uphold the Commissioner's
determination, "even if the record arguably could justify a
different conclusion, so long as it is supported by substantial
evidence." Rodriquez Pagan v. Sec'y of Health & Human Servs.,
819 F.2d 1, 3 (1st Cir. 1987). While the Commissioner's findings
of fact are conclusive if supported by substantial evidence,
questions of law are reviewed de novo. Ward v. Comm'r of Social
Security, 211 F.3d 652, 655 (1st Cir. 2000).

**B.    Social Security Disability Standard**

An individual is considered disabled if he is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The Social Security Administration has promulgated a five-step sequential analysis to determine whether a claimant is disabled.  See 20 C.F.R. § 404.1520(a)(4).  The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or medically equals an impairment listed under Appendix 1 of Subpart P of Part 404 of Title 20 of the Code of Federal Regulations; (4) whether the claimant has the residual functional capacity to perform his past relevant work; and (5) whether the impairment prevents the claimant from doing any other work considering the claimant's age, education, and work experience.  Id.

The claimant bears the burden in the first four steps to show that he is disabled within the meaning of the Act. Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 7 (1st Cir. 1982).  Once the claimant has established that he is unable to return to his former employment, the burden shifts to the

Commissioner to prove the fifth step, that the claimant is able to engage in substantial gainful activity that exists in significant numbers in the national economy.  Id.

### III. THE HEARING OFFICER'S DECISION

Applying the five-step sequential evaluation, at the first step, the hearing officer found that Amaral had not engaged in substantial gainful activity since January 25, 2008.  Admin. R. 14.  At the second step, the hearing officer found that Amaral's insulin-dependent diabetes mellitus, depression, and anxiety disorder constituted severe impairments during the relevant time period.  Id.  At the third step, however, the hearing officer found that Amaral's impairments did not meet or medically equal one of the listed impairments in Appendix 1 of Subpart P of Part 404.  Id. at 15.

At the fourth step, the hearing officer found that Amaral retained the residual functional capacity to perform medium work with the following limitations: only occasional climbing and balancing; only simple, routine, repetitive, competitive tasks involving only simple decisionmaking in a stable work environment; no complex or detailed tasks; and only working in an environment without any significant interpersonal interaction with coworkers or the public.  Id. at 16.  Based on this residual functional capacity and the vocational expert's testimony, the hearing officer found that Amaral could return to past relevant

work as a warehouse worker.  Id. at 19.  In the alternative, the
hearing officer found that there were other jobs in the local and
national economies which Amaral could perform, such as
handpackager, bench assembler, and surveillance systems monitor.
Id. at 19 n.4.  Thus, the hearing officer concluded that Amaral
had not been under a disability during the relevant time period.
Id.

## IV.  ANALYSIS

Amaral disputes the hearing officer's findings on the fourth
step of the disability analysis: the determination of Amaral's
residual functional capacity and the determination that Amaral
could perform past relevant work as a warehouse worker.  Pl.'s
Mem. 5.  Amaral argues that the hearing officer's residual
functional capacity assessment is flawed for three reasons.  Id.
at 5-6.  First, Amaral contends that the hearing officer
improperly discredited Amaral's subjective complaints and
incorrectly gave little weight to the opinions of his treating
physicians.  Id. at 6.  Second, Amaral contends that the hearing
officer did not properly consider Amaral's "combination of
impairments."  Id.  Lastly, Amaral contends that the hearing
officer did not properly consider the testimony of the vocational
expert.  Id.

### A.  Credibility Determination

In making the residual functional capacity assessment, the

13

hearing officer was required to follow a two-step process to evaluate the credibility of Amaral's claimed symptoms. Admin R. 16. At the first step, the hearing officer must determine whether there exists an impairment that could reasonably be expected to produce Amaral's pain or other symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). At the second step, the hearing officer must "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." Id. Applying this analysis, the hearing officer concluded:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could not reasonably be expected to cause the alleged symptoms to the degree alleged and that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

Admin R. 17.

Amaral objects to this determination, characterizing it as circular reasoning. Pl.'s Mem. 15-16. Regardless of whether the hearing officer's statement is inherently circular, such a conclusory statement, without further explanation, cannot be a sufficient basis for a negative credibility finding. See Davidson v. Astrue, No. CV10-0012-PHX-NVW, 2010 WL 5252838, at *9 (D. Ariz. Dec. 10, 2010) (holding that a conclusory statement alone would not be "reasoned conclusion" but that the hearing

14

officer's "specific, clear, and convincing" explanation supported

a credibility finding).  Faced with a similar argument, my

colleague Judge Wake explained,

> At first glance, the contention appears to hold weight,
> but a review of the remainder of the [hearing officer's]
> residual functional capacity analysis indicates that the
> [hearing officer] did weigh [the claimant's] testimony
> prior to reaching his conclusion.  He did not discredit
> [the claimant's] testimony <u>because</u> it was inconsistent
> with  his  residual  functional  capacity  assessment.
> Rather, he explained that he was rejecting it <u>to the
> extent</u> it was inconsistent with his assessment and then
> went on to explain <u>why</u> he was rejecting it.

<u>Barry</u> v. <u>Astrue</u>, No. CV-09-1677-PHX-NVW, 2010 WL 3168630, *10 (D.

Ariz. Aug. 10, 2010).  So here.

In this Circuit, in evaluating subjective symptoms, the

hearing officer must "investigate all avenues presented that

relate to subjective complaints."  <u>Avery</u> v. <u>Sec'y of Health &

Human Servs.</u>, 797 F.2d 19, 28 (1st Cir. 1986).  Factors the

hearing officer must consider include:

> (1) The  nature,  location,  onset,  duration,  frequency,
> radiation, and intensity of any pain; (2) Precipitating
> and  aggravating  factors  (e.g.,  movement,  activity,
> environmental   conditions);   (3)   Type,   dosage,
> effectiveness, and adverse side-effects of any pain
> medication; (4) Treatment, other than medication, for
> relief of pain; (5) Functional restrictions; and (6) The
> claimant's daily activities.[3]

<u>Id.</u> at 29.  The hearing officer, however, need not "slavishly

discuss all factors relevant to analysis of a claimant's

---

[3] While the <u>Avery</u> factors only discuss "pain," Social
Security Ruling 96-7p makes it clear that the factors also apply
to "other symptoms."  SSR 96-7p, 1996 WL 374186, at *3.

credibility and complaints of pain in order to make a supportable
credibility finding." <u>Vining</u> v. <u>Astrue</u>, 720 F. Supp. 2d 126, 138
(D. Me. 2010).

Here, the hearing officer detailed the extent of Amaral's
alleged physical and mental symptoms, medications, functional
limitations, and daily activities, as required by <u>Avery</u>.  Admin.
R. at 16-17.  The hearing officer then concluded that Amaral's
noncompliance in regulating his diabetes was "clearly
inconsistent" with his allegations of severe symptoms and
disabling limitations.  <u>Id.</u> at 18.  The hearing officer made his
negative credibility finding after considering all of the
evidence in the record, which includes Amaral's noncompliance in
regulating his diabetes.  Where a hearing officer observes and
evaluates a claimant, and makes specific findings, his
credibility finding is entitled to deference.  <u>Frustaglia</u> v.
<u>Sec'y of Health & Human Servs.</u>, 829 F.2d 192, 195 (1st Cir.
1987).  Accordingly, the hearing officer's negative credibility
determination is based on substantial evidence and is affirmed.

> **B.  Treating Sources**

Generally, the hearing officer gives more weight to the
opinions of examining sources than those of non-examining
sources.  20 C.F.R. § 404.1527(d)(1).  On issues reserved to the
Commissioner, such as residual function capacity findings,
examining sources are not given special significance by mere

virtue of the existence of a treating relationship.  20 C.F.R. §
404.1527(e)(2)-(3).  The hearing officer may choose not to adopt
examining source opinions if they are inconsistent with the other
substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2).
Should the hearing officer decide to give the opinion of a
treating source limited weight, he must provide "good reasons"
for doing so.  <u>Id.</u>  In that case, the opinions of non-examining
sources may be given more or less weight based on the
circumstances and may constitute substantial evidence.  <u>Rose</u> v.
<u>Shalala</u>, 34 F.3d 13, 18 (1st Cir. 1994).  Regardless of the
source, a hearing officer must evaluate numerous factors in
deciding the relative weight to give to a medical opinion,
including: length, frequency, and quality of any treatment
relationship; the specialization of the source; the
supportability of the opinion; and the consistency of the opinion
with the record as a whole.  20 C.F.R. § 404.1527(d)(1)-(6).

Amaral contests the hearing officer's evaluation of Laxer's
opinion regarding Amaral's alleged mental limitations.  Despite
Dr. Laxer's own admission that she did not conduct any
psychological testing, she completed a questionnaire for the
Massachusetts Department of Transitional Assistance concluding
that Amaral's depression was disabling.  Admin. R. at 567.  In a
separate questionnaire for the University of Massachusetts
Medical School Disability Evaluation Services program, Dr. Laxer

was unable to complete portions of the questionnaire, instead deferring to Amaral's psychiatrist. Id. at 783. Concerning the mental limitations, the hearing officer gave less weight to Dr. Laxer's opinion, noting that Dr. Laxer is not a psychiatrist and did not conduct any psychological testing. Id. at 18 n.2. Because of these factors, the hearing officer's decision to give little weight Dr. Laxer's opinions is supported by substantial evidence and is affirmed.

Amaral next challenged the hearing officer's decision to give little weight to Cordeiro's opinion of disabling mental restrictions associated with disabling GAF scores. The hearing officer reasoned that this opinion was "internally inconsistent" with Cordeiro's treatment notes, which indicated that Amaral generally remained "stable" during the treatment period. Id. at 18. Amaral objects to this conclusion, arguing that remaining stable implies that his condition was "static, not changing," and that remaining stable "does not negate a severe disabling psychological impairment." Pl.'s Mem. 9. Amaral's argument is not persuasive, however, because the form also includes a check box for "no progress," which better fits Amaral's proposed meaning for stable as static, or not changing. See, e.g., Admin R. 287. An alternate interpretation of the form, which is consistent with the hearing officer's finding, is that Amaral's progression was stable over much of the treatment period, save

for one report in June 2008 which indicated his condition was
worsening. Id. at 544. Whichever interpretation is appropriate,
it is not for the Court to reweigh the evidence or substitute its
judgment for that of the hearing officer. Irlanda Ortiz, 955
F.2d at 769. Thus, the hearing officer's decision to give little
weight to Cordeiro's opinion that Amaral's depression was
disabling is supported by substantial evidence and is affirmed.

Lastly, the hearing officer gave little weight to the GAF
score of 45 that Dr. Hill assigned to Amaral, deeming it
inconsistent with the physician's actual findings at the mental
status examination. Admin. R. 18. Dr. Hill's initial
examination revealed that Amaral was logical, oriented, with
grossly intact attention and concentration, intact memory, good
eye contact, and had no suicidal or homicidal ideation. Id. at
527-28. Although Dr. Hill concluded that Amaral suffered from
anxiety, depressive symptoms, and panic disorder with
agoraphobia, he plainly stated that Amaral's alcohol use may have
been "exacerbat[ing]" these symptoms. Id. at 528. Dr. Hill also
noted that he could not explain why such a "bright man" like
Amaral struggled with controlling his diabetes. Id. These
statements from Dr. Hill substantiate the hearing officer's
conclusion that Amaral's GAF score, while low, was skewed by his
alcohol use and uncontrolled diabetes.

Because there is substantial evidence in the record to

19

support the hearing officer's findings, the hearing officer's decision to assign little weight to Amaral's treating sources is affirmed.

### C.    Combination of Impairments

Amaral next contends that the hearing officer failed to consider the combined impact of Amaral's multiple impairments, and that the hearing officer instead assessed each impairment separately. Pl.'s Mem. 15.  Amaral's arguments here mirror his prior arguments regarding the hearing officer's credibility finding and the weight given to treating sources.  In the decision, the hearing officer's residual functional capacity assessment comports with the opinions of the non-treating sources that he explicitly adopted, namely those of Drs. Fischer and Gorbovitsky.  Admin. R. 18.  Amaral's arguments that the hearing officer failed to consider the entire record carry no weight in view of the Court's ruling that there was substantial evidence to support the negative credibility finding and the weight assigned to the treating sources.

### D.    Vocational Expert Hypotheticals

Lastly, Amaral challenges the hypothetical questions that the hearing officer posed to the vocational expert, arguing that the hypothetical questions do not align with his actual exertional and non-exertional limitations.  Pl.'s Mem. 17-18.

At the hearing, the hearing officer posed two hypotheticals

to the vocational expert.  Admin R. 46-47.  The first
hypothetical was based on the assumption that the hearing officer
would find all of Amaral's allegations "to be credible and
supported by the weight of the medical evidence of record." Id.
at 46.  Based on those assumptions, the vocational expert opined
that such an individual would be unable to work at all.  Id.  The
second hypothetical was based upon the assessments of Drs.
Fischer and Gorbovitsky.  Id.  The hearing officer enumerated to
the vocational expert the specific limitations contained in those
reports.  Id. at 46-47.  Based on these assumptions, the
vocational expert determined that the hypothetical individual
could return to his past warehouse work.  Id. at 47.  In the
alternative, the vocational expert determined that there existed
a number of jobs in the national economy the hypothetical
individual could perform, such as bench assembly worker or
surveillance systems monitor.  Id.  In light of the vocational
expert's answers to the hypothetical questions, the hearing
officer found Amaral capable of returning to past relevant work
as a warehouse worker.  Id. at 19.  Alternatively, the hearing
officer found that there exist other jobs in the local and
national economies which Amaral could perform.  Id. at 19 n.4.

    The hearing officer's reliance on the second hypothetical
naturally flows from his finding regarding Amaral's credibility
and the limited weight he assigned to the treating sources.

Given that the Court here rules that substantial evidence
supported the hearing officer's adoption of the non-examining
sources in the residual functional capacity assessment, there is
similarly no error in relying on a hypothetical based on that
assessment.

## V.    CONCLUSION

For all the reasons stated above, this Court DENIES Amaral's
motion for summary judgment, ECF No. 11, and ALLOWS the
Commissioner's motion for an order affirming the decision of the
hearing officer, ECF No. 14.  Judgment shall enter for the
Commissioner.

SO ORDERED.


/s/ William G. Young

WILLIAM G. YOUNG
DISTRICT JUDGE